**In United States District Court**
**For the District of Delaware**

UNITED STATES OF AMERICA

Criminal Complaint

v.

CASE NUMBER:  07- **99M**

CHRISTOPHER WATERMAN,
Defendant.

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my

knowledge and belief: 1) on or about May 12, 2007  in the District of  Delaware, Defendant CHRISTOPHER

WATERMAN  did knowingly possess with intent to distribute crack cocaine base, in violation of Title 21, United States

Code, Section(s)  841(a)(1) and (b)(1)(C);  and  2) on or about April 2007 to on or about May 12, 2007  in the District

of  Delaware, Defendant CHRISTOPHER WATERMAN did knowingly  possess in and affecting interstate and foreign
commerce, a firearm,  after having been convicted of a felony crime punishable by imprisonment for a term exceeding
one year, in violation of Title 18, United States Code, Section(s)  922(g)(1) and 924(a)(2).

I further state that I am a  Special Agent, ATF  and that this complaint is based on the following facts:
        See attached Affidavit

Continued on the attached sheet and made a part hereof:    Yes

_____
                              Veronica Hnat
                              Special Agent, ATF

Sworn to before me and subscribed in my presence,

May 14, 2007                                              at    Wilmington, DE_____
Date                                                                City and State

  Honorable Mary Pat Thynge
  United States Magistrate Judge_____                _____
Name & Title of Judicial Officer                              Signature of Judicial Officer

F I L E D

MAY 1 4 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

I, Veronica M. Hnat, being duly sworn, state as follows:

1.  I am a Special Agent with the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have been so employed for over seventeen years. During that time, my duties have included the investigation of firearms and narcotics offenses at both the State and Federal levels. Your Affiant is currently assigned to the Operation Disarm Task Force and has been so assigned since October, 2003. During the course of your affiant's law enforcement career, your affiant has received law enforcement training on the investigation of firearms offenses on over fifty occasions. Your affiant has participated in over one hundred investigations of firearms offenses and participated in the seizure of over fifty firearms. Your Affiant has also had over one hundred conversations with police officers and Federal agents about the facts and circumstances of firearms offenses. During the course of your affiant's law enforcement career, your affiant has also received law enforcement training on narcotics offenses, including offenses that involve crack cocaine base. From this training, your affiant has learned the weights, packaging, street values, paraphernalia, and other factors that are indicative of crack cocaine base being possessed for purposes of distribution, as opposed to for personal use or other purposes. During the course of your affiant's law enforcement career, your affiant has participated in over fifty searches for crack cocaine base, and seizures of crack cocaine base. Your Affiant has also participated in numerous investigations of crack cocaine base offenses and has had numerous conversations with police officers and Federal agents about the facts and circumstances of narcotics offenses. Your Affiant has been employed as a law enforcement officer in various capacities since 1989.

2.  Unless otherwise stated, the information in this affidavit is based upon your affiant's personal knowledge.

3.  The seizure of all the below stated evidence occurred on May 12, 2007, in the City of Wilmington, State and District of Delaware, as stated to me by the Wilmington Police Officers involved in this investigation. The Officers have approximately 12 years of law enforcement experience between them, and have made numerous arrests for narcotics and firearms violations.   Your affiant learned the information in paragraphs 3 through 14 from the Wilmington Police Officers involved in this investigation.

4.  On May 12, 2007, at approximately 2052 hours, Wilmington Police received an anonymous 911 call that a black male, armed with a handgun in waist area, wearing black clothing and a black hat was standing on the porch of a certain named location, (from here on "the location"), Wilmington, DE. The Officers, in uniform and a marked police vehicle, arrived in the area and turned on their spotlight to illuminate the porch of the location in, Wilmington, DE. There were five individuals standing on the porch, three black males and two black females. There was only one black male with black clothing and a black base ball cap; the other two black males were wearing white tee shirts. The black male wearing the black clothing, later identified as, defendant, Christopher Waterman, was standing with his back up against the door of the location in, Wilmington, DE.

-2-

5.  As the Officers got out of their vehicle, they observed Waterman with his hands in both front pockets of his pants. The Officers asked to see everyone's hands; everyone on the porch complied except for Waterman. The Officers then removed their weapons and repeated their commands to Waterman. After the third command, Waterman removed his hands from his pocket and placed them over his clothing in his waistband area. The Officers told him to put his hands up, but Waterman then removed one of his hands and placed it on the knob of the door while his other hand remained in his waistband area, which, from their training and experience, is consistent of a subject being armed with a weapon there.

6.  While the Officers were ordering Waterman to show his hands, he was trying to turn the knob on the door for the residence of the location in, Wilmington, DE, while keeping one hand near his waist area. It appeared to the Officers that Waterman was trying to get into the residence but the door was locked. At this point, the door opens and a black female; (known as Person 1 from here out), came out of the residence trying to see what was going on. The Officers observed Waterman run into the residence towards the back of the house. While he was going through the house, the Officers observed several children in the house watching television. The door was shut for a brief second, but opened again and Waterman was walking from the back of the house towards the front door where the Officers were. He had his hands up.

7.  Waterman was taken into custody, patted down for Officer safety and placed into the Officers' marked patrol car. While the Officers were patting Waterman down, they noticed that his belt was undone.

8.  The Officers explained to Person 1 why they were at the residence and the circumstances of the 911 call. Person 1 stated that he/she noticed police lights out front and went to the front door. As he/she opened the door, which was locked, he/she saw Waterman go into the residence. He/She stated that he/she was concerned seeing all the police activity in front of the house. He/She stated that there are no guns allowed in this house, and to go ahead and look. The Officers questioned Person 1 to see if he/she lived at that residence, he/she indicated no but that it was his/her daughters residence. Person 1 also said that Waterman did not live at that residence. While speaking to Person 1, an occupant that was on the front porch stated that, he/she (known from here as Person 2), lived there and that he/she would allow the police to search the house because he/she would not allow guns to be in his/her house with his/her children staying there.

9.  The Officers proceeded through the house to where they observed Waterman run. The room beyond where the children were watching television was the kitchen, which leads to the back door of the residence. The Officers checked to see if the rear door of the residence was locked and it was. They then conducted a search of the kitchen area and located a loaded Burgo, model HW3, .32 caliber seven shot revolver with brown wooden handles, serial

-3-

number 54617 in a black holster. The firearm was located between the wall and a carton of sodas, the gun was sticking up above the top of the container in plain view. They also located, approximately 12 inches away from the firearm and on the floor next to the carton of sodas, two clear plastic sandwich bags, one knotted at the top and the other untied, which contained an off white chunky substance, which later field tested to be crack cocaine. The bag that was knotted contained four separate clear bags, two which contained larger chunks of crack cocaine, another which contained a smaller chunk of crack cocaine and the forth had eight individual smaller bags each containing a small amount of crack cocaine. The untied bag contained a smaller crushed amount of crack cocaine.

10. The Officers then interviewed a juvenile (known from here on as Person 3), who was in the residence when Waterman ran into the kitchen area. Person 3 stated that he/she was watching television when Waterman ran through the room and into the kitchen. He/she stated that Waterman came right back out. Person 3 said that no one else was in that room until the Police came in.

11. As the Officers were leaving the location, Person #1 questioned the Officers about whether Waterman would get out on bail tonight because he/she feared Waterman would come back there. Person #1 stated that his/her daughter just got this house and didn't want anything to happen to her. One of the Officers explained that Waterman may be charged federally through the FED UP program. While the Officer was explaining this to Person #1, the neighbor started telling Person #1 that he/she read about that program in the newspaper and that he will be locked up for good. During the time of the above conversation, Waterman was in the police vehicle with the windows rolled up. The above conversation took place on the porch of the location. The Officers then proceeded to transport Waterman to the Police Station. During the transport Waterman questioned the Officers about the FED UP program and inquired what it was about. One of the Officers told Waterman that it was in his best interest if he did not say anything. Waterman then stated "how are you going to charge me with a gun and the cocaine if it was not on me?" The Officer replied with, "Who said anything about a gun and cocaine?" At that time, the Officers had not advised Waterman of the seizure of the gun and the crack cocaine, nor had they shown the gun and drugs to Waterman.

12. The Officers arrived at the Police Station and conducted a search of Waterman's clothing, which revealed that his buckle to his belt was undone. The Officer asked Waterman why his belt was unbuckled; he stated "I had to pee." The Officer noted to Waterman that his zipper was up and his button was buttoned. He then replied that, "the belt is broken." The Officer then asked what hole he normally fixes the buckle to and tried to buckle his belt. The Officer was able to secure the belt on Waterman and pulled on the belt and it remained buckled. The Officer noted that the aforementioned firearm was inside a holster that had loops for a belt strap, and would require Waterman to unbuckle his belt in order to remove it.

-4-

13. After several times indicating he wanted to talk to the Officers, the Officers then read Waterman his Miranda rights. Waterman waived his rights and told them that he wanted to talk. He asked about a lawyer being present. The Officers stated that one will be appointed for you and you can have one while being questioned, but one is not here now. The Officers stated that they would not ask him any questions and that it was up to him if he would like to talk. Waterman told the Officers he would like to talk to them. Waterman stated that he wanted to talk and said that the revolver belonged to the person described earlier as Person #2. He stated that Person #2 has been trying to sell the gun to him. The Officers asked him to describe the gun that Person #2 was trying to sell; Waterman stated that it was a seven shot revolver with brown handles. He said that he handled the aforementioned firearm several times over the past few weeks. When the Officers asked him why he ran, Waterman replied that he knew he had a warrant for his arrest. The Officers later confirmed that Waterman in fact did have an existing warrant for his arrest.

14. Your affiant learned from the Officers, who have training and experience in performing field tests on crack cocaine and in weighing narcotics, that they properly performed a field test and weighed the off white chunky substance found in the clear plastic bags located in the residence on the aforementioned date. The Officers informed your affiant that the substance tested positive to be crack cocaine and to have a total weight, including packaging, of approximately 11.5 grams. Based upon your affiant's training and experience, your affiant knows that crack cocaine is crack cocaine base and believes that the quantity of the crack cocaine seized is more than would be customarily possessed for personal use and that it is consistent with possession for distribution purposes. Your affiant also believes that the possession and presence of a firearm for protection of the defendant, the drugs, the packaging of the drugs and the expected proceeds is consistent with possession of a firearm in furtherance of possession with intent to distribute crack cocaine.

15. Your affiant reviewed the computer criminal history information for Christopher Waterman from the Delaware Justice Information System (DELJIS) and the National Crime Information Center (NCIC) and learned that the defendant has a prior felony conviction for Possession With Intent to Deliver a Narcotic Schedule II Controlled Substance from on or about January 18, 2006 in the New Castle County Superior Court for the State of Delaware, a crime punishable by imprisonment for a term exceeding one year.

16. Your affiant reviewed the computer criminal history information for Person # 2 from the DELJIS and learned that he/she has one prior felony conviction for Robbery and three misdemeanors convictions for Criminal Impersonation.

17. Your affiant reviewed the above reference seized firearm. From your affiant's training and experience, and from prior discussions with ATF Agents who are expertly trained and experienced in determining the interstate nexus of firearms, your affiant knows that the above mentioned firearm would have affected interstate or foreign commerce prior to its recovery in Delaware.

18. Based upon your affiant's training and experience, your affiant submits that there is probable cause to believe that the above-mentioned seized firearm contained the frame and receiver of a firearm, and that the firearm appeared to be capable of expelling a projectile by action of an explosive.

19. Wherefore, based upon your affiant's training and experience, your affiant submits that there is probable cause to believe that the defendant violated Title 18 U.S.C. Section 922(g) and 924(a)(2) by possessing in and affecting interstate or foreign commerce a firearm, after having previously been convicted of a felony crime punishable by imprisonment for a term exceeding one year; and Title 21, U.S.C. Section 841 (a)(1) and (b)(1)(C); by possessing with intent to distribute approximately 11.5 grams of crack cocaine base and respectfully requests that the Court issue a Criminal Complaint and arrest warrant charging these offenses.

Veronica M. Hnat
Special Agent, ATF


Sworn to and subscribed in my presence
This 14th[th] day of May, 2007

Honorable Mary Pat Thynge
United States Magistrate Judge
District of Delaware