IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 07-73-SLR |
| | : | |
| CHRISTOPHER WATERMAN, | : | |
| | : | |
| Defendant. | : | |

## MEMORDANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS

Defendant, Christopher Waterman, by and through his undersigned counsel, Edson A. Bostic, Federal Public Defender for the District of Delaware, respectfully submits this Memorandum of Law in support of his Motion to Suppress Physical Evidence and Statements. For the reasons set forth below, Mr. Waterman seeks to exclude the Government's admission, at trial, of any and all physical evidence illegally seized by law enforcement officials on or about May 12, 2007, and any statements made during, or subsequent to, his illegal seizure and arrest.

## I. INTRODUCTION

On May 12, 2007, the Grand Jury for the District of Delaware indicted Mr. Waterman for knowingly possessing with the intent to distribute more than five grams of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), knowingly carrying and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A), and knowingly possessing a firearm that has been transported in interstate commerce to Delaware, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On September 21, 2007, Mr. Waterman filed a Motion to Suppress Physical Evidence and Statements.

The grounds for Mr. Waterman's motion related to his illegal seizure and arrest on May 12, 2007. On November 30, 2007, this Court conducted an evidentiary hearing to determine Mr. Waterman's suppression motion.

Mr. Waterman submits that law enforcement officials lacked reasonable suspicion or probable cause to conduct the investigative stop that led to his arrest because the stop was based on an uncorroborated tip.  See Whiteley v. Warden, Wyoming State Penitentiary, 401 U.S. 560 (1971); Robinson v. Clemons, 987 F.Supp. 280 (D.Del. 1998).  Thus, all evidence, including any alleged statements made by Mr. Waterman, should be suppressed in accordance with the "fruit of the poisonous tree" doctrine expressed in Wong Sun v. United States, 371 U.S. 471 (1963).

## II.  FACTUAL BACKGROUND

### A.  Investigative Summary[1]

On or about May 12, 2007, Wilmington police officers received an anonymous call stating that a black male wearing black clothing and a black hat was standing on a porch at 1009 W. 7th Street, in Wilmington, Delaware with a gun in his waistband area.  The police officers arrived at the scene and turned on a spotlight that illuminated the residence's porch and house number.  The officers saw two African-American females and three African-American males standing on the porch.  Mr. Waterman, who was one of the individuals, wore a black baseball hat, black shirt and dark-colored jeans.

The officers exited their vehicles and asked to see the individuals' hands.  According to officers, Mr. Waterman was the only individual that did not comply with this request.  The officers

---

[1]  The following facts were taken from the discovery.

removed their guns and repeated their verbal command to Mr. Waterman, who allegedly had both hands in his pants pocket. On the officers' third command, Mr. Waterman removed his hands and immediately placed them on his waistband area. Mr. Waterman allegedly took one hand away from his waistband area and grabbed at the front door of the residence, which appeared to be locked.

According to the discovery, a female witness opened the door, and Mr. Waterman immediately placed both hands into his waistband and ran into the house. One of the officers allegedly saw Mr. Waterman run through the living room toward the back of the house, and heard someone yell, "[p]ut those fucking guns away. I have kids in there."

Although the facts are not clear from the discovery, the officers allegedly told the individuals standing on the porch to move away from the door. One of these individuals, however, grabbed the door and attempted to close it, but an officer "kicked the door open so [the officers] could have a clear line of sight into the residence." At that time, the officers allegedly saw Mr. Waterman walking away from the television with his hands in the air, and ordered him to come out of the residence. Mr. Waterman complied, and the officers took him into custody.

Sgt. Morrisey arrived at the scene and told an unidentified individual about the anonymous call. According to the discovery, all of the witnesses stated that there was no gun in the house because small children were inside the residence. Although the facts are not clear from the discovery, an individual residing at the residence allegedly gave the officers permission to search the house for guns. After receiving consent, officers searched the home and allegedly found a loaded .32 caliber revolver in the kitchen.

Sgt. Misetic arrived on the scene and spoke to an unidentified individual, who allegedly told the officer about Mr. Waterman's prior gun and drug charges. The individual also allegedly gave Sgt.

Misetic consent to search the house.  Officers returned to the kitchen area and found crack cocaine.

Officers transported Mr. Waterman to turnkey for processing.  During the transport, Mr. Waterman and the officers allegedly had the following exchange:

| | |
|---|---|
| **Mr. Waterman:** | I heard them talking about the FED UP Program.  What is that about? |
| **Officer:** | It is in your best interest if you do not say anything. |
| **Mr. Waterman:** | "How can you charge me with a gun and the cocaine if it was not on me?" |
| **Officer:** | Who said anything about a gun and cocaine? |
| **Mr. Waterman:** | What are you charging me with? |

The officer allegedly did not respond to Mr. Waterman's question.

The officers searched Mr. Waterman's clothing and noticed that his belt was not buckled. The officers asked Mr. Waterman why his pants were not buckled, and he allegedly responded, "I had to pee."  The officers pointed out to Mr. Waterman that his pants were zipped and buttoned, and he allegedly responded, "[t]he belt is broken."  The officers buckled Mr. Waterman's belt and took it into evidence.  The officers also recovered $96.06 from Mr. Waterman's right front pocket.

The officers read Mr. Waterman's Miranda rights, which he allegedly waived.  Mr. Waterman allegedly stated that the revolver belonged to "Mr. Waters," who had attempted to sell the revolver to him.  Mr. Waterman allegedly admitted to handling the revolver and having contact with it during the past few weeks.  Officers asked Mr. Waterman why he ran into the house, and he allegedly responded that he ran because he knew he had outstanding warrants for his arrest.

4

B. **Evidentiary Hearing Testimony**

1. **Patrolman Cecilia Ashe's Testimony**

Officer Ashe testified that she and her partner received a 911 call on the night of May 12, 2007, reporting a subject armed with a gun. (Tr. 6). Officer Ashe testified that it was raining during the evening in question, and that the officers responded to 1009 West Seventh Street. (Tr. 6). Upon arrival, the officers observed five subjects standing on a porch, and Officer Ashe testified that the officers had trouble seeing the address. (Tr. 6).

Officer Ashe testified that she turned on her spotlight to illuminate the porch area and saw the house number and individuals standing on the porch. (Tr. 6-7). Officer Ashe further testified that she saw two females and three males, and that Mr. Waterman, who stood in the center and directly in front of the front door, matched the suspect's description. (Tr. 7-8). Specifically, Mr. Waterman wore a black hat, all black jacket and baggy, dark colored jeans. (Tr. 8-9).

Officer Ashe testified that she and her partner exited the vehicle and asked the individuals to raise their hands for safety. (Tr. 8). Officer Ashe testified that Mr. Waterman was the only person who did not comply, and that he had both hands in his pockets at the time of the command. (Tr. 9). Officer Ashe testified that the officers repeated the command, and that Mr. Waterman removed one of his hands, placed the other on his waistband area and turned the doorknob behind him. (Tr. 9). Officer Ashe speculated that the door appeared to be locked. (Tr. 9).

In response, Officer Ashe drew her firearm because she believed that Mr. Waterman had a gun in his waistband, and the officers continued to give commands to see his hands. (Tr. 11). Officer Ashe testified that Mr. Waterman did not comply and attempted to turn the knob of the front door. (Tr. 10). According to Officer Ashe, Deborah Waters emerged from the house and immediately

5

began to yell, "put your fucking guns away, put your guns away. I have children in this house." (Tr. 10-11).

Officer Ashe testified that Mr. Waterman immediately fled into the residence, and that she could see into the living room area of the home. (Tr. 11). Officer Ashe testified that Ms. Waters attempted to close the door, but her partner ordered her not to close the door so that they could have a clear vision of Mr. Waterman. (Tr. 11). Officer Ashe testified that her partner went up to the porch and placed his foot in the doorway to prevent the door from being closed. (Tr. 11). Officer Ashe acknowledged that her police report stated that her partner had kicked in the door as Ms. Waters tried to close it, but testified that "what I mean[t] by that is that he had placed his foot inside the doorway." (Tr. 11-12).

Officer Ashe testified that she saw Mr. Waterman run through the living room area toward the kitchen, and that several children were in the home. (Tr. 13). Officer Ashe testified that Mr. Waterman emerged from the kitchen area with his hands up and walked toward her, and that she continued to give him verbal commands to keep his hands in the air. (Tr. 13). Mr. Waterman complied with Officer Ashe's commands, and she took him into custody. (Tr. 13).

Officer Ashe further testified that Tehray Waters, one of the female individuals on the porch, became disorderly as she took Mr. Waterman into custody. (Tr. 15-16). Officer Ashe testified that Ms. Waters was also taken into custody. (Tr. 16).

Officer Ashe also testified that several officers arrived at the scene, including Sergeant Morrisey and Sergeant Misetic, the acting supervisors. (Tr. 17). According to Officer Ashe, Sergeant Morrisey made the decision to search the residence, and he explained to the Waters family why the officers were at the residence. (Tr. 18-19). Officer Ashe testified that Willy Waters, one of

the individuals standing on the porch, stated that he lived at the residence and gave consent for a search of the residence. (Tr. 18-19). During the subsequent search, Officer Ashe and Sergeant Morrisey found a gun in the kitchen area. (Tr. 20-22).

Officer Ashe testified that Sgt. Misetic was familiar with Mr. Waterman because of previous drug and gun charges, and he asked the family for permission to search for narcotics. (Tr. 23-23). Officer Ashe testified that Sgt. Misetic obtained consent, and she found several bags of an off-white substance that field tested positive for cocaine. (Tr. 24). Officer Ashe also testified regarding Mr. Waterman's alleged statements during his transport and processing. (Tr. 24-29).

Specifically, Officer Ashe testified that Mr. Waterman, who had been advised of his <u>Miranda</u> rights, agreed to speak to Sgt. Misetic and initially denied knowledge of the firearm. (Tr. 29-30). Officer Ashe testified that Mr. Waterman later stated that he had touched the gun, and that Mr. Waters had tried to sell it to him for $450. (Tr. 30). Mr. Waterman allegedly stated that he ran into the house because he had capiases for his arrest. (Tr. 30). Officer Ashe also testified that Mr. Waterman was able to describe the weapon, and that she was not aware of any warrants for his arrest. (Tr. 30-31).

On cross-examination, Officer Ashe testified that she did not know who made the call reporting the tip, and had no knowledge of the caller's awareness of the suspect. (Tr. 32-33). Officer Ashe testified that the officers could not see the numbers on the house but stopped in front of it because of shadows on the porch. (Tr. 35). Officer Ashe testified that she did not make any observations which would have confirmed that any of the individuals on the porch were armed. (Tr. 36).

Officer Ashe testified that she was approximately eight to ten feet from the porch, and was

7

at the door to her vehicle. (Tr. 37). Officer Ashe testified that she could see Mr. Waterman's hands until he placed his hand behind his back to open the front door. (Tr. 38-40). Officer Ashe testified that she and her partner did not approach the porch because of safety reasons and acknowledged that her partner used force to prevent the door from being closed. (Tr. 42-44). Officer Ashe further testified that no weapons or contraband were found on Mr. Waterman. (Tr. 48).

   **2. <u>Tehray Waters' Testimony</u>**

   Ms. Waters testified that she lived at 1009 West Seventh Street with her four children, and that Mr. Waters did not live at her residence. (Tr. 71-72). Ms. Waters testified that she and Mr. Waterman were entering her home to discuss their son when the police "came flying down the street with their little high beams on and with their guns out." (Tr. 73). Ms. Waters further testified that "as the cops [were] flying down the street . . . my brother and his friend and my sister came speeding in behind us." (Tr. 74).

   Ms. Waters testified that Deborah Waters, her mother, was in her home watching television at the time that she and Mr. Waterman were going into the house. (Tr. 75). Ms. Waters acknowledged that she "rais[ed] hell" because the police pulled out guns, and stated that she identified herself as the adult resident of 1009 West Seventh Street. (Tr. 75).

   Ms. Waters testified that all of the individuals came back out onto the porch, but she did not see what happened to Mr. Waterman because she had already been placed into the back of the patrol car. (Tr. 76). Ms. Waters testified that no one asked her for permission to search her home, and that neither she nor Mr. Waters gave the officers permission to search the home. (Tr. 77-78).

   On cross-examination, Ms. Waters testified that she began to "rais[e] hell" when the police arrived because it was Mother's Day and the officers had their guns drawn. (Tr. 83-88). Ms. Waters

testified that the police put her into a patrol car parked around the corner from her house prior to Mr. Waterman's arrest. (Tr. 83, 85). Ms. Waters testified that Mr. Waterman never ran into the house, as recounted by prior testimony, and that her mother was not the only adult in the house upon police arrival. (Tr. 86). Ms. Waters also testified that prior testimony stating that four or five individuals were on the porch upon police arrival, and that Mr. Waterman had refused to comply with the officers' commands, was incorrect. (Tr. 85).

### III. ARGUMENT

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." See U.S. CONST. Amend. IV. The United States Supreme Court noted that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9 (1968) (citing Union Pacific R.R. Co. v. Botsford, 141 U.S. 250, 251 (1891). "As a general rule, the Supreme Court has interpreted the Fourth Amendment's reasonableness requirement to mean that seizures and searches must be based on probable cause and executed pursuant to a search warrant." United States v. Johnson, 238 F.Supp.2d 663 (D.Del. 2002).

If an officer does not have a warrant, he or she "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has reasonable suspicion that criminal activity is afoot." Id., citing United States v. Robertson, 305 F.3d 164 (3d Cir. 2002) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)); see also United States v. Sharpe, 470 U.S. 675 (1985) (stating that an investigatory Terry stop may ripen into an arrest if the duration of the stop or the amount of

force used is "unreasonable"); <u>Wiers v. Barnes</u>, 925 F.Supp. 1079, 1087 (D.Del. 1996) (stating that the Fourth Amendment requires application of the "reasonableness standard" to actions by law enforcement officers, and the test is an objective one: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.") (citations omitted); <u>United States v. McGrath</u>, 89 F.Supp.2d 569 (E.D. Pa. 2000) (stating that the continued detention of a suspect must be based upon probable cause).

Pursuant to <u>Terry</u>, reasonable suspicion of criminal activity is defined as "specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant that intrusion." <u>Terry</u>, 392 U.S. at 21 (stating that this "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."). In evaluating reasonable suspicion, courts must consider the totality of the circumstances. <u>United States v. Valentine</u>, 232 F.3d 350 (3d Cir. 2000).

The Third Circuit and Supreme Court have consistently recognized that the government cannot rely on a tip unless it demonstrates the basis of the informant's knowledge and the informant's reliability or veracity, and that courts must consider the tip's content and other surrounding circumstances. <u>See</u> <u>e.g.</u> <u>Whiteley v. Warden, Wyoming State Penitentiary</u>, 401 U.S. 560, 567 (1971) (stating that if the "initial impetus" for an arrest is an informer's tip, information gathered by the arresting officers can be used to sustain a finding of probable cause for an arrest that could not be supported by the tip alone, if the information acquired by the arresting officers corroborates the informer's tip that the arrestee committed the felony or was in the process of committing the felony); <u>see also</u> <u>Illinois v. Gates</u>, 462 U.S. 213 (1983) (stating that corroborating the details of an informant's

tip is an important step in establishing the veracity of an informant);  United States v. Ubiles, 224 F.3d 213 (3d Cir. 2000) (rejecting an anonymous informant's gun tip as basis for reasonable suspicion where the tip did not indicate that the individual was going to use the gun unlawfully or had threatened to commit a crime, as well as safety arguments regarding the the defendant's gun); see also United States v. Hill, No. CRIM.A.04-41-JJF, 2005 WL 1745662 (D.Del. July 19, 2005) (stating that corroboration is "particularly important when an informant has no past history of reliability.") .

In Alabama v. White, 496 U.S. 325, 326 (1990), the Supreme Court identified the problems inherent in police reliance on anonymous tips:

> [A]n anonymous tip seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is 'by hypothesis largely unknown, and unknowable.  This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a Terry stop . . . [T]he tip [here] provides virtually nothing from which one might conclude that [the caller] is either honest or his information reliable; likewise, the [tip] gives absolutely no indication of the basis for the [caller's] predictions regarding . . . criminal activities.  By requiring 'something more' . . . we merely apply what we said in [Adams v. Williams, 407 U.S. 143 (1972): 'Some tips, completely lacking in indicia or reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would  be authorized.

Id. at 329.  See also Florida v. J.L., 529 U.S. 266 (2000) (holding that officers lacked reasonable suspicion to make a Terry stop based on a "bare" anonymous tip that a black male standing at a bus stop carried a gun); United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006) (concluding that an informant's vague tip was reliable because of the police officer's prior relationship with the informant, the informant's real-time narration of suspicious behavior and the suspicious activity matching a pattern of criminal activity of which the police were aware).

In United States v. Roberson, 90 F.3d 75 (1991), the Third Circuit addressed the necessity

for corroboration of an anonymous informer's tip.  In <u>Roberson</u>, an anonymous caller identified the defendant's physical description and stated that he was selling drugs at a specified location.  The anonymous tip was relayed to the police, who saw a man meeting the defendant's description standing on a corner known to be a "hot area" for drug trafficking.  The officers observed the defendant walk to a car that was facing the wrong way down a street, and lean in as if speaking with the vehicle's occupants.  The officers, who observed no indicia of drug activity, approached the defendant and observed the butt of a gun protruding from his pants.  The officers patted the defendant down and seized a gun and drugs.

The Third Circuit found that the anonymous informer's tip had no predictive value that could corroborate future events, and that the police had no basis for assessing the informant's reliability or the grounds in which the informant believed that a crime was being committed.  The Court made clear that where the officers failed to corroborate readily observable facts and did not observe suspicious behavior, no reasonable suspicion existed to support an investigative stop.  The Court also noted that the "police were not powerless to act on the non-predictive, anonymous tip," and could have "set up a surveillance of the defendant . . . to observe suspicious behavior."  <u>Id.</u> at 81.

Similar to <u>Roberson</u>, in the instant case, the officers observed no suspicious behavior to corroborate the fleshless, anonymous tip that provided non-predictive information regarding Mr. Waterman.  The anonymous tip indicated that the suspect had on dark clothing, which Mr. Waterman did, but provided no further descriptive information or name regarding the suspect.  As admitted to by the testifying officer, the police went to Ms. Waters' residence because of "shadows" on the porch, but did not know if it was the correct address when they stopped in front of it.  More importantly, the officers made no attempts to independently corroborate the tip or to see if any of the individuals

12

were engaged in suspicious behavior.

Instead, according to the officers' version of the events, they arrived at the scene, flashed their spotlight on the porch area and immediately ordered everyone to put their hands up, a highly egregious act that was not supported by reasonable suspicion or probable cause. The officers' conduct demonstrates a total disregard for whether any of the individuals were in legal possession of a firearm and that they were not concerned with corroborating the anonymous tip.

Although the Government may argue that the officers' safety may have been in jeopardy, the testifying officer stated that she never saw a gun in Mr. Waterman's possession, and that he had only attempted to enter the home. Attempting to walk away from the police, particularly in light of the egregious way in which the officers approached the individuals on the front porch with guns drawn, does not give rise to reasonable suspicion or probable cause in this case.

As testified to by Ms. Waters, Mr. Waterman was not on the porch when the officers arrived on the scene, but, rather, attempting to enter the home with Ms. Waters. The officers' version of events, which conflicts with their written report, suggests that Mr. Waterman was not compliant with the officers' commands to see his hands. At best, however, the officers' version of events demonstrates only that Mr. Waterman had attempted to enter the house when the officers arrived at the scene.

Regardless of the conflicting accounts, what remains constant is that the police, acting on a bare bones tip that suggested no danger, had no information indicating that Mr. Waterman (specifically) was in illegal possession of an alleged gun, or that he was going to use the alleged gun for unlawful purposes or had threatened to do so. Moreover, the officers found no weapons or drugs on Mr. Waterman that later corroborated the tip or provided probable cause for his arrest and

13

continued detention.  See Terry.

Here, the officers made no attempt to corroborate the anonymous tip or observe suspicious behavior, used force to enter a residence without permission and arrested Mr. Waterman without probable cause.  The officers' conduct demonstrates a blatant disregard for the Fourth Amendment's protections.  The Supreme Court and Third Circuit have made clear that such lack of corroboration for an anonymous tip is insufficient to support an investigatory stop or probable cause for an arrest. See, e.g., J.L.; Alabama v. White; Roberson.

## IV.  CONCLUSION

For the foregoing reasons, the physical evidence must be suppressed because it is the fruit of

the officers' unlawful activities.  Law enforcement officials lacked reasonable suspicion or probable

cause to conduct the investigative stop of Mr. Waterman, which led to his arrest.  Thus, Mr.

Waterman's seizure was unlawful, and all evidence obtained after his arrest should be suppressed as

fruit of the poisonous tree.  See Wong-Sun v. United States, 371 U.S. 407 (1963).


                                        Respectfully submitted,


                                        __/s/_____
                                        Edson A. Bostic, Esquire
                                        Federal Public Defender


                                        Attorney for Defendant Christopher Waterman

Federal Public Defender
One Customs House
704 King Street, Suite 110
Wilmington, DE 19801
(302) 573-6010
ecf_de@msn.com

Dated: January 7, 2008


                                        15