IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : Criminal Action No. 07-73-SLR |
| Plaintiff, | : |
| v. | : |
| | : |
| CHRISTOPHER WATERMAN, | : |
| | : |
| Defendant. | : |

### GOVERNMENT'S POST-HEARING REQUEST TO DENY
### THE DEFENDANT'S MOTION TO SUPPRESS

The United States, by and through Colm F. Connolly, United State's Attorney for the District of Delaware, and Shawn E. Martyniak, Special Assistant United State's Attorney for the District of Delaware, hereby requests the Court to deny the Defendant's *Motion to Suppress Physical Evidence and Statements*.

### I. INTRODUCTION.

On May 12, 2007, the Grand Jury for the District of Delaware indicted Mr. Waterman for knowingly possessing with the intent to distribute more than five grams of a mixture containing a detectable amount of cocaine base, in violation of Title 21, *United States Code*, Sections 841(a)(1) and (b)(1)(B); knowingly carrying and possessing a firearm in furtherance of a drug trafficking crime, in violation of Title 18, *United States Code*, Section 924(c)(1)(A); and knowingly possessing a firearm that has been transported in interstate commerce to Delaware, in violation of Title 18, United States Code, Sections 922(g)(1) and (924(a)(2).

On September 21, 2007, the defendant filed a *Motion to Suppress Physical Evidence and Statements*. The Government filed a response on November 21, 2007. On November 30, 2007, the Court conducted an evidentiary hearing to determine Mr. Waterman's suppression motion.

The Government's argument is essentially the same as in its previous *Motion*. The defendant was not in custody when he discarded the gun and cocaine that was subsequently located by police. The United States Supreme Court is clear in its ruling; in order to constitute the seizure of an individual, there must be either the application of physical force or submission by the suspect. A show of authority by the police which a suspect fails to yield is insufficient to trigger protections. *California v. Hodari D.*, 499 U.S. 621, 626-7 (1991). Additionally, the contraband that was located was found by police in a common area of the residence. The Defendant discarded the contraband that was recovered by the police. Officers are free to recover abandoned property. *Abel v. United States*, 362 U.S. 217, 241 (1960).

## II. FACTUAL ALLEGATIONS.[1]

On May 12, 2007 at approximately 8:52p.m., Wilmington Police Officers Ashe and Nowell responded to 1009 W. 7th Street, Wilmington, Delaware in reference to a complaint regarding an armed citizen. The anonymous caller reported that a black male, wearing black clothing and a black hat was standing on the porch of 1009 W. 7th Street. The caller reported that the individual had a firearm located in the waistband area of his pants.

The Officers responded to 1009 W. 7th Street and noticed five individuals standing on the porch of the residence. The Officers noted, of the individuals on the porch, two (2) were female and three (3) were male. Christopher Waterman, herein defendant, was found to be wearing a black baseball cap, a black t-shirt, and dark colored jeans. None of the other individuals fit the description given by the anonymous caller.

The Officers requested that all of the individuals show the officers their hands. Four of

---

[1]The facts in this section are taken from relevant police reports.

the individuals complied. The defendant was the only individual that failed to comply to the Officer's request. The Officers removed their firearms from the holster and repeated the command.

The defendant removed his hands from his pockets and placed both hands on the waistband area of his trousers. The Officers then asked the defendant to place his hands in the air. The defendant removed one hand from his waistband and began grabbing at the front door; his other hand remained at the waistband.

The front door appeared to be locked; the defendant repeatedly attempted to open it. The defendant kept one hand on his waistband as he continued his attempt to open the door with his free hand. A female, later determined to be Deborah Waters, opened the door from the inside. The defendant placed both hands onto his waistband area and fled into the house. The officers gave commands for all of the individuals to step away from the front door. All of the individuals, except for Deborah Waters, complied.

As the Officers approached, Deborah Waters attempted to close the door. Officer Ashe saw the defendant retreat through the living room and into the kitchen area of house. The Officers were able to move Ms. Waters and gain access to the front door. Officer Nowell kicked the door open preventing Ms. Waters from closing it. Officer Nowell actions created a clear line of sight into the residence. As Officer Nowell opened the door, the Officers saw the defendant walking towards them, away from the kitchen area with his hands in the air. The defendant then complied with the Officer's commands to come out of the house. The defendant was placed into custody.

The Officers explained to Deborah Waters the nature of the call they received. All of the

3

individuals stated that no firearms were in the residence because there were small children in the residence. Sergeant Morrisey of the Wilmington Police Department spoke to Mr. Willie Waters. Mr. Waters claimed to live at 1009 W. 7th Street. Mr. Waters gave the Officers permission to search for a firearm.

Patrolwoman Ashe responded to the kitchen which is located at the rear of the residence. The Officer checked the back door in the kitchen and found the door was locked. Sgt Morrisey entered the kitchen and approached two cases of soda on the floor. Between the cases of soda and the wall, Officer Morrisey located a .32 caliber silver revolver with a brown grip; the firearm was partially exposed and in plain view. The firearm was found stored inside of a black holster. The black holster had a belt-loop. The firearm was fully loaded with seven (7) rounds.

Sgt Misetic of the Wilmington Police Department arrived on scene and explained to Deborah and Willie Waters that he would like to search the residence to ensure that no drugs were left behind. Willie Waters again consented to the search. Later, the Officers interviewed individuals at the scene. Several of the individuals stated that the defendant was the only person that went into the kitchen.

Officers responded back to the area of the kitchen where the cases of soda were located. Officer Ashe located several plastic baggies near the cases of soda that the firearm was behind. The baggies contained various amounts of an off-white powdery substance. The substance later field tested positive for the presence of cocaine base and had a preliminary weight of approximately 11.5 grams.

As the defendant was in transit to the police station for processing, the defendant stated, "I heard them talking about the FED UP program. What is this about?" The Officer responded

that it was in the defendant's best interest if he did not say anything. The defendant responded, "How can you charge me with a gun and cocaine if it was not on me?"

While in processing, Officer Ashe conducted a search of the defendant's clothing. The Officer noticed that the defendant's belt buckle was undone. When asked why his belt was undone, the defendant responded, "I had to pee." The Officer noted that the defendant's pants were buttoned and the zipper zipped. The defendant responded that the belt was broken. The Officer then checked the belt and was able to securely fasten the belt and the belt remained buckled.

Officer Ashe read the defendant his *Miranda* warnings. The defendant waived his *Miranda* protections. The defendant stated that the firearm belonged to Mr. Waters. He further advised Mr. Waters was attempting to sell the defendant the firearm. The defendant stated that the firearm is a seven shot revolver with a brown handle. The defendant further stated that he had handled the firearm several times in few weeks prior to the arrest.

### III. HEARING TESTIMONY.

#### A. Wilmington Police Patrolwoman Ashe.

Officer Ashe, a ten year police veteran (T-3), testified that she and her partner, Detective Nowell, responded to 1009 West Seventh Street on the night of May 12, 2007, in reference to a 9-1-1 call of an individual armed with a gun. (T 4-6). Officer Ashe did not know who made the call to 9-1-1. (T 32-33).

Upon arriving on scene, Officer Ashe noticed that the area consisted of row homes. (T-6). It was difficult for the officers to see the house numbers due to rainy weather, but the officers did notice that at one of the addresses in the middle of the block there were five people located on a

5

porch.(T-6). In an effort to see the house numbers, Officer Ashe illuminated the spotlight on her vehicle.(T-6). This action sufficiently lit the area (T-6). Once illuminated, Officer Ashe was able to determine that, of the five individuals on the porch, there were two females and three males. (T-7). She noted that the individual standing in the center of the group directly in front of the front door matched the description given by the caller. (T-7).

Officer Ashe then testified that the Officers exited their vehicle and asked the individuals on the porch to show their hands. (T-8). All of the individuals complied except for the defendant. (T-9). The Officers gave a second command to the defendant telling him to put his hands in the air. On the second command, the defendant removed his hands placed one hand on his waist-band and the other on the door knob located behind him. (T-9). The defendant continued to fail to obey the commands of the Officers causing Officer Ashe to draw her firearm. (T-10). The defendant continued to attempt to open the door behind him. (T-10).

A female, later determined to be Deborah Waters, exited the home and began yelling at the Officers. (T-11). The defendant then fled into the residence. (T-11). Ms. Waters attempted to close the door to the residence (T-11). According the Officer Ashe, Officer Nowell told Ms. Waters not to close the door. (T-11). Despite the order, Ms. Waters attempted to shut the door. (T-11). In response, Officer Nowell placed his foot into the doorway to prevent it from being shut. (T-11).

Officer Ashe testified that she could see the defendant running through the living room area towards the back of the residence (T 12-13). She testified that the defendant then emerged from the kitchen area with his hands up. (T-13). The defendant was then taken into custody. (T-13).

Officer Ashe testified that Sergeant Morrisey arrived on scene (T-17). Officer Ashe testified that Sergeant Morrisey spoke with Mr. Willie Waters at the scene (T-18). Mr. Waters indicated to the Officers that he lived at 1009 West Seventh Street and that the Officers could search the residence for any firearms. (T-19). Officer Ashe and Sergeant Morrisey entered the house and responded to the rear of the residence (T-20).

Officer Ashe checked the rear door of the residence and noted that it was still locked (T-20). Sergeant Morrisey indicated that he saw a gun stuck between the wall and cases of soda in the kitchen; Officer Ashe saw the firearm after it was pointed out to her by the Sergeant. (T-20). Sergeant Morrisey recovered the firearm from its location by the cases of soda. Officer Ashe testified that the recovered firearm was located in a holster that had two belt loops on it. (T-21).

The Officers responded back outside; Officer Nowell placed the firearm in the back of the patrol vehicle. (T-22). Shortly thereafter, Sergeant Misetic arrived on scene. (T-22). Sergeant Misetic was familiar with the defendant from prior drug investigations and asked Mr. Waters permission to search the home for any narcotics. (T 22-23). Officer Ashe responded back to the kitchen area and searched the area of the soda cases. (T-24). After moving the cases of soda, Officer Ashe found several sandwich baggies of a off-white substance that field-tested positive for crack cocaine. (T-24).

Officer Ashe testified that she then transported the defendant to the Wilmington Police Station. (T-25). En route to the station, the defendant inquired what he was being charged with. (T-26). After Officer Ashe failed to respond, the defendant stated that he could not be charged with the gun and drugs because they were not located on him. (T-26).

Once at the station, Officer Ashe read the defendant his Miranda warnings. (T-28). The

defendant agreed to speak with Sergeant Misetic (T-30). After initially denying any knowledge of the firearm, the defendant stated that Mr. Waters previously attempted to sell him the firearm for $450; the defendant also stated that he previously handled the firearm (T-30). The defendant also stated that he ran from the police because he had capiases for his arrest. (T-30). Officer Ashe found no record of any active warrants or capiases for the arrest of the defendant. (T-30).

### B. Tehray Waters.

Tehray Water's testimony stands in stark contrast to that of Officer Ashe's. Tehray Water's testified on behalf of the defendant. It was determined that Ms. Waters and the defendant have a child together. (T-16).

As opposed to Officer Ashe's testimony that the Officers traveled down the street and then turned on the search-light, Ms. Waters testified that the police, "came flying down the street with their little high beams on and with their guns out." (T-73). While Officer Ashe testified that Ms. Waters did not become involved until the defendant was being taken into custody (T-15), Waters testified that she was "rasing hell" right after the police arrived. (T-75). It is worth noting that Ms. Waters was taken into custody, so she has no idea what Willie Waters told the officers.

Tehray Waters testimony regarding the location of individuals on the porch was confusing. Tahrey Waters testified that her and the defendant were entering the house as the police drove up. (T-73). Ms. Waters testified that the three other individuals were on the porch at that point. (T-74). On cross, however, she testified that the five individuals were in the house when the police arrived. (T-81). Then abruptly, Ms. Waters changed her testimony to reflect that there were three individuals on the porch when the police arrived. (T-81). Upon clarification, Ms. Waters again testified that everyone was in the living room by the time the police got out of their car. (T-82). Later, Ms. Waters again changed her story back to the version with people still on the porch upon police arrival. (T-95). Inexplicably, Ms. Waters goes back to

8

the version with everyone inside the home with the door closed. (T-97).

## IV. LEGAL ARGUMENT.

### A. The defendant was not in custody until after he discarded the gun and drugs.

The defendant's motion should be denied as he was not "in custody" until after he discarded the gun and narcotics. The defendant's motion seems to based on the theory that the Wilmington Police Officers lacked reasonable suspicion to stop Mr. Waterman. However, Mr. Waterman was not stopped, detained, or in custody prior to discarding the handgun and cocaine.

The United State's Supreme Court has made clear that in order to constitute a seizure of a person there must be either the application of physical force or submission, by the suspect, to the Officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991). A show of authority by the police to which a subject does not yield is insufficient. *See id.* Moreover, if no physical force accompanies the show of authority, and an individual then chooses to ignore the show of authority, there is no seizure until the officer applies physical force or the individual submits to the show of authority. *See id.* at 624-627.

In the case at bar, the Officers responded to 1009 West 7th Street as a result of an anonymous call. The caller described the individual with the handgun. The officers asked the individuals on the porch to show their hands. All of the individuals, except the defendant complied. Once he removed his hands from his pockets, the defendant refused the officer's commands and attempted to enter the residence. The defendant was ultimately successful in his attempts. The defendant then fled into the residence ignoring the officers commands. Moments later, the defendant emerged from the house with his hands in the air. At that point he was taken into custody.

The defendant, citing *Terry v. Ohio*, 392 U.S. 1, argues that the police lacked "specific, articulable facts which, taken together with reasonable inferences from those facts, reasonably

9

warrant that intrusion." *Terry*, 392 U.S. at 21. The defendant then applies this standard to the point of the encounter when the police first arrived; the problem with the defendant's analysis is that the analysis should begin from when the defendant is taken into custody, not from the initial encounter. All of the facts, up to the point of surrender should be viewed as part of the analysis to determine probable cause.

The defendant also cites several cases in support of his position; however, these cases are distinguishable from the case at bar. In *Florida v. J.L.*, 529 U.S. 266 (2000), the United State's Supreme Court held that police officers lacked reasonable, articulable suspicion to make a *Terry* stop based solely on an anonymous tip of drug sales. In *J.L.*, the Officers approached a suspect subsequent to an anonymous tip regarding drug dealing and took him into custody; unlike the case at bar, there was no refusal to follow commands, flight from officers, nor was there any grasping at the waistband. Additionally, there was no information from the anonymous caller regarding the suspect's possession of a firearm. *Id.* At 268.

In *United States v. Roberson*, 90 F. 3d 75 (1991), the Third Circuit ruled a drug stop invalid because the police failed corroborate readily observable facts. Again, as in *J.L.*, the police stopped the defendant after receiving the anonymous information. Again, the anonymous caller did not report that the suspect possessed a firearm. Finally, the officers did not possess the additional information, as in the case at bar, such as the defendant's behavior upon contact and flight from the officers.

It is worth noting that the Third Circuit, in *Roberson*, in a footnote discussion, did examine cases from other Circuits addressing anonymous gun tips: *United States v. Clipper*, 973 F.2d 944 (D.C.Cir.1992), *cert. denied*, 506 U.S. 1070 (1993) and *United States v. DeBerry*, 76 F.3d 884 (7th Cir.1996). *Roberson*, 90 F. 3d at 81. In *Clipper*, after corroborating the person's location and general description, and without noticing any unusual behavior, the police

officers frisked the defendant at gunpoint. *Clipper*, 973 F.2d at 946. The District of Columbia Circuit upheld the stop, finding that "society's plain interests in protecting its members, and those who serve them, from armed and dangerous persons" controlled. *Id.* at 951. The court distinguished the case from drug cases, stating that "[w]here guns are involved, ... there is the risk that an attempt to 'wait out' the suspect might have fatal consequences." *Id.* Thus, the risk of police searches based on fabricated tips was overcome by the interests of safety. *Id.*

In *DeBerry*, after corroborating the person's location and general description, an officer walked towards the defendant and said that he wanted to talk. *DeBerry*, 76 F.3d at 885. The defendant turned and "moved his hands as if he might draw his gun." *Id.* at 885. The officer drew his gun and frisked the defendant. *Id.* "The Seventh Circuit upheld the stop, relying in part on the defendant's threatening gesture.... However, the court in dicta stated that its holding would have been the same even in the absence of the gesture." *Roberson*, 90 F.3d at 81 n. 4 (citing *DeBerry*, 76 F.3d at 885- 86). The *DeBerry* Court followed the *Clipper* court's reasoning, finding that the interest in protecting people from armed individuals outweighed the "right of the people to be let alone." *DeBerry*, 76 F.3d at 886.

While the Third Circuit discussed these cases, it did not adopt them. Instead, it chose to "leave that question for another day." *Roberson*, 90 F.3d at 81 n. 4. However, the Third Circuit did indicate that it may adopt the *DeBerry /Clipper* reasoning if presented with the appropriate case. In the instant case, if the flight of the defendant and the location of the discovered contraband are discarded, that facts case are very similar to the *DeBerry/Clipper* scenario.

When viewing the analysis of "reasonable articulable suspicion", we must begin at the point that the defendant is seized. Under a *Hodari D.* analysis, the defendant was not seized until he emerged from the kitchen with his hands in the air. At that point the officers had a specific

11

location, a specific description of the individual that was armed, and a specific description of the individual's clothing. The officers responded to the specific location and recognized one individual, the defendant, that matched the description of the armed individual given by the anonymous caller. After attempting to contact the defendant, the defendant refused to put his hands in the air and instead used one hand to attempt to open the door and the other to hold at the waistband of his pants. The defendant then fled into the home that he was standing in front of. Moments later, the defendant emerged from the kitchen area with his hands in the air. It is at this point that "reasonable, articulable suspicion" should be evaluated. It is clear that, at that point, there was sufficient reason for the police to believe that the defendant was engaged in criminal activity.

Even assuming that the analysis begins upon the Officers initial contact with the defendant, there is some indication, in *Roberson*, that the Third Circuit would view the stop as reasonable due to the overriding concern for officer and public safety. As in *DeBerry/Clipper*, the Officers here received an anonymous call relating a specific location, a specific physical description, a specific description of clothing, and a specific location of the firearm. Perhaps even without the flight and accompanying facts, the Third Circuit would determine that the attempted stop was valid.

B. The defendant's rights were not violated when Officers seized abandoned property.

After the defendant hid the firearm and cocaine in the kitchen of the residence, the contraband became abandoned property. As abandoned property, the police were free to recover the contraband without violating any of the defendant's rights.

In *Abel v. U.S.*, the Supreme Court determined that warrant-less searches and seizures of abandoned property did not violate the Fourth Amendment. *Abel v. U.S.*, 362 U.S. 217 (1960). The Court wrote, "[t]here can be nothing unlawful in the Government's appropriation of . . .

abandoned property." *Id.* at 241.

In the case at bar, the defendant fled from the police and into the residence at 1009 W. 7th Street. The defendant, moments later emerged from the house. The Officers then searched the residence pursuant to consent from a resident of the home. The Officers located a handgun and approximately 11.5 grams of cocaine base in the kitchen area of the home. Once the defendant discarded the contraband, the Officers were free to recover the items.

### III. CONCLUSION.

The Government respectfully submits that the defendant's motion should be denied. Prior to the discarding of the firearm and crack cocaine, the defendant never was physically apprehended nor did he acquiesce to the commands of the police. Furthermore, once the defendant discarded the firearm and cocaine, prior to being placed in custody, the contraband became abandoned property subject to recovery by police.

WHEREFORE, the United States respectfully asks the Court to deny the Defendant's *Motion*.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

By: /s/ Shawn Martyniak
Shawn E. Martyniak (De. I.D. No. 4433)
Special Assistant United States Attorney
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, Delaware 19899-2046

Dated: January 22, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>CHRISTOPHER WATERMAN,<br><br>    Defendant. | )<br>)<br>)<br>)<br>) Criminal Action No. 07-73-SLR<br>)<br>)<br>)<br>) |

**ORDER**

For the reasons stated in the Government's Motion dated January 22, 2008, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Suppress Physical Evidence and Statements is DENIED.

Dated: _____

                                                  Sue L. Robinson
                                                  UNITED STATES DISTRICT JUDGE