IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE



| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Crim. No. 07-073-SLR |
| ) | |
| CHRISTOPHER WATERMAN, ) | |
| ) | |
| Defendant. ) | |

---

Colm F. Connolly, United States Attorney and Shawn E. Martyniak, Special Assistant United States Attorney. United States Attorney's Office, District of Delaware, Wilmington, Delaware. Attorneys for Plaintiff United States of America.

Edson Bostic, Esquire, Federal Public Defender. Federal Public Defender's Office, District of Delaware, Wilmington, Delaware. Attorney for Defendant Christopher Waterman.

---

**MEMORANDUM OPINION**

April 30, 2008
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On June 5, 2007, defendant Christopher Waterman was indicted by a federal grand jury for knowingly possessing with the intent to distribute more than five grams of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and knowingly carrying and possessing a firearm that has been transported in interstate commerce to Delaware, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (D.I. 4) Before the court is defendant's motion to suppress evidence and statements based on his alleged illegal seizure and arrest on May 12, 2007. (D.I. 13) An evidentiary hearing was held on November 30, 2007. (D.I. 20) The matter is fully briefed. (D.I. 22, 23) The court has jurisdiction pursuant to 18 U.S.C. § 3231.

## II. FINDINGS OF FACT

Pursuant to Fed. R. Crim. P. 12(d), the following constitute the court's essential findings of fact as developed during the evidentiary hearing, wherein Wilmington Police Officer Cecilia Ashe ("Ashe") testified for plaintiff and Tehray Waters ("Waters") testified on behalf of defendant. (D.I. 20)

1. In May 2007, Waters lived with her four children in a house located at 1009 West Seventh Street, Wilmington, Delaware ("the residence"). (Id. at 72) The residence, situated in the middle of the block alongside other row homes, does not have a front yard. (Id. at 92) A narrow front porch, about 3 feet wide and 6 feet long, leads into a small livingroom, dining room and kitchen. There is no light on the porch. (Id. at 7, 68, 100)

2. On the evening of May 12, 2007, Mother's Day, Waters had several guests over, including: (1) defendant; (2) her sister Desiree; (3) her brother Willy; (4) her mother Deborah; and (5) an unidentified friend of Willy. (Id. at 74, 75, 78, 103) Waters testified that defendant, the father of her son, was visiting to discuss their child. With the exception of Deborah Waters, who remained inside the house watching television with several children, the others were outside on the front porch. (Id. at 75)

3. Contemporaneously, Wilmington Police Officer Ashe was on uniformed patrol duty in the area around West Seventh Street driving a marked police vehicle equipped with sirens and lights.[1] (Id. at 3-5) Sometime before 9:00 p.m., an anonymous individual ("tipster") telephoned "911" to report seeing a "subject" with a gun at 1009 West Seventh Street. (Id. at 6, 32, 33) The tipster's information was dispatched over the police radio and received by Ashe. (Id. at 32) Additional information, including the tipster's identity and reliability, source of information, time the call was received or whether the call was recorded or logged, was not conveyed to Ashe or to the court.[2] (Id. at 6, 32-33)

---

[1] Ashe has been a police officer for over ten years, one year with the Wilmington Police Department and nine years with the Arlington County Police Department, Arlington, Virginia. (Id. at 3) As a patrol officer, Ashe's responsibilities included responding to service calls from citizens, proactive policing and community policing in the patrol division. (Id. at 4) On May 12, 2007, Ashe was on duty with her partner, Officer Nowell ("Nowell"). Although Nowell responded to the residence and participated in the events in issue, he did not testify at the evidentiary hearing.

[2] All information concerning the tipster and call came from Ashe's testimony.

2

4. Ashe responded to the area approximately five minutes after receiving the dispatch call.[3] Driving onto West Seventh Street, a one-way street, Ashe was unable to discern the house numbers because it was raining and the area was poorly lit. (Id. at 6-7, 33-35) The street was lined with row homes erected adjacent to each other and situated close to the curb. (Id. at 7) Cars were parked along the curb on both sides of the street. (Id. at 34) In the middle of the block, Ashe observed the silhouettes of five people standing on the front porch of a house. (Id. at 6-7) Because Ashe was unable to determine whether this was the house identified by the tipster, she activated and shined the car's spotlight on the house and confirmed a match.[4]

5. The illumination from the spotlight also enabled Ashe to more clearly see two black females and three black males standing together on the porch of the residence. Defendant, wearing a black hat, black jacket and baggy, dark colored jeans, was standing in the center of the group directly in front of the door to the residence.[5] (Id. at 7-9) The other two men were standing to defendant's left side, one female was

---

[3] Officer Nowell responded with Ashe to the scene.

[4] The testimony of Ashe and Waters differed on when the patrol car's spotlight was activated and defendant's conduct when officers arrived. Ashe testified that the spotlight was not activated until the car was almost in front of the residence and was used to ascertain addresses of the houses. Ashe testified that the spotlight's illumination enabled her to clearly see five people standing on the porch. Conversely, Waters testified that she and defendant were entering the residence to discuss their son when the police "came flying down the street with their high beams on and with their guns out." (Id. at 73) According to Waters, she became irate because officers pulled out guns and she identified herself as the adult resident of the house. She also testified that she did not see what happened between defendant and the police because she was placed in a police car. (Id. at 76)

[5] Ashe identified this individual as defendant. (Id. at 7)

3

standing on a lower porch step and the second female was standing at the top of the porch steps.

6. Ashe and Nowell exited their patrol vehicle. Ashe positioned herself next to the vehicle's door, about 8-10 feet away from the residence. (Id. at 8, 36-37) Nowell approached the house. Ashe did not see any of the individuals on the porch brandishing a weapon. (Id. at 36) She ordered them to put their hands up in the air, for safety reasons. (Id. 8, 36-37) Everyone complied except defendant whose hands were inside his jacket pockets. (Id. at 9, 39-40)

7. From her vantage point, Ashe had an unobstructed view of defendant. Ashe did not see a weapon in defendant's hands; however, based on her training, Ashe suspected that defendant might have been armed because he had moved his hands towards his waistband. (Id. at 10) Ashe and Nowell drew their firearms as Ashe repeatedly commanded defendant to put his hands in the air. (Id. at 10) Defendant did not comply; he moved one of his hands behind his back and turned the doorknob of the front door. (Id. at 9, 41) The door did not open. Ashe thought the door was locked. (Id. at 9) Ashe continued, unsuccessfully, to order defendant to show his hands. Ashe and Nowell maintained their weapons in a drawn position, aimed at the individuals standing on the porch. (Id. at 37-38)

8. Just then, Deborah Waters opened the door and stepped onto the porch. (Id. at 10 -11) As Deborah Waters exited, defendant entered the residence. (Id. at 43) Nowell, standing near the porch, thrust his leg into the doorway to prevent the door from being shut. (Id. at 11-12)

4

9. Still standing at the patrol car, Ashe observed several children sitting on a couch watching television in the dining room area of the residence. (Id. at 13) She then watched defendant run through the living room, dining room and into the kitchen where she momentarily lost sight of defendant. (Id. at 12-13) Defendant returned to her field of vision when he walked quickly from the kitchen towards the front of the residence with his hands in the air. (Id. at 13) Ashe continued to order defendant to keep his hands in the air. Ashe did not see defendant holding a firearm. Defendant was ordered out of the residence, where he was patted down, handcuffed, taken into custody and placed in the back of a police car parked nearby. (Id. at 14, 48-49) No contraband was found on defendant. (Id. at 48)

10. As defendant was taken into custody, Tehray Waters became very upset, yelling obscenities and demanding to know the reason police were at the residence. (Id. at 76, 83, 85, 89) Waters was taken into custody and placed in the back seat of a police vehicle parked around the corner. (Id. at 16) At no time did officers ask, nor did she grant permission, to search the residence. (Id. at 76) Sometime later, Waters was issued a ticket for disorderly conduct. (Id. at 105)

11. Around the same time, Sergeant Morrisey and Sergeant Misetic, supervisory officers, arrived to establish a command scene at the residence. (Id. at 17) Sgt. Morrisey told Deborah and Willy Waters about the tipster's call and requested permission to search for a gun in the residence. (Id. at 18-19) Ashe testified that Willy Waters stated that he lived at the residence and gave permission for police to search. Willy Waters said there were no guns at the residence.

5

12. Sgt Morrisey and Ashe entered the residence to conduct a search. In the kitchen, Sgt. Morrisey discovered a gun hidden between a wall and cases of soda. (Id. at 20, 23) The gun was located in a holster with two belt loops. (Id. at 21) Nowell secured the gun in the back of a patrol car. (Id. at 22)

13. Ashe testified that Sgt. Misetic next requested permission to search the entire residence for narcotics, explaining that he was familiar with defendant's criminal history which included drugs and guns. (Id. at 23) Willy Waters consented to the second search. In the kitchen area, Ashe found several sandwich bags containing an off-white substance, which field tested positive for cocaine. (Id. at 24) Ashe secured the drugs.

14. Ashe testified that defendant made incriminating statements while on the way to Wilmington Police Station. (Id. at 25, 26, 28) Further, after verbally waiving his Miranda rights, defendant spoke with Sgt. Misetic and made statements regarding the gun, specifically that Willy Waters had tried to sell it to him. (Id. at 28, 63) Defendant explained that he ran from police because there were outstanding capiases for his arrest. (Id. at 30) Ashe testified that she not locate any active warrants or capiases for defendant. (Id. at 30-31)

## III. STANDARD OF REVIEW

1. Once a defendant challenges the legality of a warrantless search and seizure, the burden is on the government to demonstrate that the acts were constitutional. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995); United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005). The burden of proof is a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).

2. The court is charged with reviewing the "credibility of witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993); Government of the Virgin Islands v. Gereau, 502 F.2d 914, 921 (3d Cir. 1974); United States v. Williams, 400 F. Supp. 2d 673 (D. Del. 2005). A "judge engaged in adjudicative fact-finding will apply standards of credibility and proof that differ from the cognitive processes of an officer acting in the field." United States v. Bonner, 363 F.3d 213, 219 (3d Cir. 2004) (Smith, J. dissenting). Equally compelling, however, is the court's unique position to assess and evaluate the credibility and demeanor of the testifying witnesses as well as the evidence presented at the suppression hearing. " Gereau, 502 F. 2d at 921 (Credibility determinations are uniquely the province of the fact-finder" and "may be influenced by factors such as a witness' demeanor, his tone of voice and other matters not subject to appellate scrutiny.")

## IV. DISCUSSION

### A. Anonymous Tip

1. The Fourth Amendment, applicable to the States through the Due Process Clause of the Fourteenth Amendment, guarantees "the right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV; Mapp v. Ohio, 367 U.S. 643 (1961). A search without a warrant is intrinsically unreasonable and unconstitutional unless one of the

exceptions to the warrant requirement is demonstrated. United States v. Place, 462 U.S. 696, 701 (1983); Katz v. United States, 389 U.S. 347, 357 (1967).

   2. A law enforcement officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000); Terry v. Ohio, 392 U.S. 1 (1968). Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Wardlow, 528 U.S. at 123; United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000). In assessing whether the officers had reasonable suspicion, the court must consider "the totality of the circumstances." United States v. Sokolow, 490 U.S. 1, 8 (1981); United States v. Robertson, 305 F.3d 164 (3d Cir. 2002). "[R]easonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences, personal observation of suspicious behavior and information from sources that have proven to be reliable." United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002) (citations omitted).

   3. In order for an informant's tip to be the basis for reasonable suspicion, the tip must be reliable both in its assertion of illegality and in its tendency to identify a determinate person. Florida v. J.L., 529 U.S. 266, 272 (2000); Valentine, 232 F.3d at 354. Annonymous tips are analyzed by considering the totality of the circumstances. United States v. Nelson, 284 F.3d at 472; Alabama v. White, 496 U.S. 325 (1990) (Court developed totality of the circumstances test to determine whether an anonymous tip could provide reasonable suspicion for a Terry stop and concluded two factors are

8

important: (1) the ability to corroborate significant aspects of the tip; and (2) the tip's ability to predict future events.).

4. In J.L., an anonymous caller reported to the police that a young black male wearing certain clothes was carrying a gun and was standing at a bus stop. Id. at 268. The record did not reflect a recording of the tip call nor any information about the informant. Officers responded to the area and saw three black males, one wearing the shirt described by the tipster. The officers did not see defendant with a gun nor did they observe any illegal conduct. Nonetheless, an officer approached, then frisked the defendant and recovered a gun. The Court found the officers' suspicion that the defendant was carrying a weapon was based solely on a call made from an unknown location by an unknown caller. The Court concluded that this tip "lacked the moderate indicia of reliability" and had no predictive information from which police could test the informant's knowledge or credibility. Id. at 271. "All police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [defendant]." Id.

4. Moreover, the fact that the tip matched the suspect's visible attributes was insignificant. According to the Court, this argument "misapprehends the reliability needed for a tip to justify a Terry stop." Id. at 272. Although a tip accurately describing a suspect's location and appearance enables the police to identify the person accused by the tipster, it does not demonstrate that the tipster has knowledge of concealed criminal activity. See United States v. Roberson, 90 F.3d 75 (3d Cir. 1996) (Court rejected an anonymous tip particularly describing defendant located on a specific street

9

corner as an insufficient basis for reasonable suspicion); United States v. Crandell, 509 F. Supp. 2d 435, 443 (D. N.J. 2007) (Court found anonymous tip call about a black male with dread locks and blonde tips wearing a tan shirt and blue jeans in possession of a handgun in his waistband lacked any indicia of reliability and ordered evidence suppressed). But see e.g., United States v. Robertson, 305 F.3d at 164 (3d Cir. 2002) (Court distinguished facts under review from Florida v. J.L., even though an anonymous tip was involved, because officers were in hot pursuit of robbery suspects who boarded a public bus with weapons); United States v. Valentine, 232 F.3d 350 (3d Cir. 2000) (Court found face-to-face anonymous tip sufficient basis for reasonable suspicion because a face-to-face tip given to officers immediately after the alleged crime provided the officers the opportunity to assess the tipster's credibility and reliability first hand and officers were in a high crime area at 1:00 a.m. encountering the defendant, who walked away when police approached); United States v. Nelson, 284 F.3d at 472 (Court found reasonable suspicion based on an anonymous tip received on a private line used only by police officers' families and confidential informants, in part because the caller was not truly anonymous since both the caller and a lieutenant knew that another officer could identify the caller).

    5. The analysis does not change when an anonymous tip reports a person carrying a gun. Significantly, the Supreme Court has specifically rejected arguments to create a "firearm exception" where a tip alleging the presence of a weapon would "justify a stop and frisk even if the accusation would fail standard pre-search reliability testing." J.L., 529 U.S. at 272. The Court determined an automatic exception would "rove too far" and "enable any person seeking to harass another to set in motion an

intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." Id. at 272-273.

6. Defendant contends that police lacked reasonable suspicion or probable cause to conduct an investigatory stop that led to his arrest because the stop was based on an uncorroborated tip; consequently, all evidence, including statements, should be suppressed pursuant to the "fruit of the poisonous tree" doctrine. (D.I. 22)

7. Plaintiff does not address the adequacy of the anonymous tip that caused police to arrive at the residence. Plaintiff instead begins its analysis with defendant emerging from the kitchen with his hands in the air. (D.I. 23) At that point, plaintiff argues that the police had sufficient information to establish reasonable suspicion to believe defendant was engaged in criminal conduct: (a) police had a specific location and description of a suspect's clothing that matched what defendant was wearing; (b) defendant refused to obey a police command; and (c) defendant entered the residence without permission. Plaintiff also argues that the gun and drugs became abandoned property after defendant allegedly hid them in the kitchen.

**B. Analysis**

1. It is undisputed that the anonymous tip dispatched over the police radio was the only reason Ashe responded to the residence. The record also clearly reflects that this "911" call reporting an armed subject at 1009 North Seventh Street was made by an anonymous caller. J.L., 529 U.S. at 270 (A tip is truly anonymous if it is made from an unknown location by an unknown caller). Significantly, the tip at bar is similar to the fleshless tip in J.L., criticized by the Supreme Court as lacking evidence of reliability and predictive information. Missing is crucial information about the tipster, including: (1)

the tipster's history of providing information to police, including reliability issues; (2) the time of day the tip was received; (3) additional details in the tip, including whether it was a based on a personal observation or whether there was an urgency in police responding to the residence immediately; (4) identity and gender of tipster; (5) location of tipster in relation to the information conveyed; (6) whether the call was placed on a phone line designated for families or confidential informants; and (8) whether the tipster directed the information to a particular police offer. These deficiencies might have been addressed by introducing a recording of the call or presenting testimony from the dispatcher. See e.g., United States v. Williams, 400 F. Supp.2d at 673 (tape recording of call admitted at evidentiary hearing).

2. The content of the tip is likewise flawed. Ashe's testimony, the source of all information about the tip, established the tipster stated that someone at the residence had a gun. Considering that the possession of a gun or the licensed possession of a concealed weapon are permissible in Delaware, the tipster did not warn of a crime in progress nor predict future crimes to be committed by the subject with the gun. 11 Del C. § 1441.

3. Even after receiving the tip, there no evidence presented that police conducted any type of investigation to corroborate the bare bones tip. Compare United States v. Smith, 2008 WL 819892 (E.D. Pa. March 26, 2008).[6] Nonetheless, Ashe and

---

[6] In Smith, police followed up on an anonymous complaint concerning an illegal drug selling operation occurring at a certain location by a black man named "Gary" residing at a specific address. Police conducted a background check on "Gary", conferred with a confidential informant who confirmed the anonymous caller's information and, subsequently, arranged a controlled buy with "Gary".

12

her partner traveled, immediately, to the residence, having conducted no additional inquiries, surveillance or attempts to corroborate the anonymous call. The officers' immediate reaction "does nothing to support the credibility of the tipster." United States v. Crandell, 509 F. Supp. 2d at 449. Furthermore, the record suggests that there was a presumption of illegal conduct based, seemingly, on mere assumption or evidence not before the court.[7]

4. When the officers arrived at a private residence with guests celebrating Mother's Day, the events unfolded very quickly. Ashe shined the spotlight on the residence, matched the house number with the tipster's call, but observed no suspicious behavior to corroborate the tip. From an unobstructed view, Ashe did not observe defendant or any of the individuals standing on the porch brandishing a weapon. Still, Ashe ordered everyone to put their hands in the air. Ashe explained that this command was for her protection, however, she did not elaborate specific reasons to buttress this generalized conclusion.

5. By the time Ashe commanded everyone on the porch to put their hands in the air, she and Nowell had effected a Terry-like stop that required reasonable suspicion to justify the stop. The subsequent events, that is, defendant's failure to follow Ashe's command, the officers drawing their weapons, and defendant's suspected conduct in the residence, cannot cure this initial constitutional violation. See e.g., Crandell, 509 F. Supp. 2d at 451.

---

[7] In response to a question regarding the reason for the arrival of supervisory officers, Ashe testified: "Our department policy is that a sergeant will respond to any type of gun call or any type of call that would be determined to be a felony, they [supervisory officers] automatically respond to those calls." (D.I. 20 at 48-49)

### B. The Exclusionary Rule

1. The exclusionary rule mandates that evidence derived from constitutional violations may not be used at trial if it has been obtained "by exploitation of that illegality." Wong Sun v. United States, 371 U.S. 471 (1963). Evidence is admissible, however, if it were obtained "by means sufficiently distinguishable to be purged of the primary taint." Id.

The Third Circuit has interpreted Wong Sun to involve two discrete inquiries:

> (1) the proximity of an initial illegal custodial act to the [acquired evidence]; and (2) the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, that illegal arrest.

United States v. Burton, 288 F.3d 91, 99 (3d Cir. 2002). The first question evaluates the attenuation between the "illegal police conduct and the evidence allegedly exploited from it." Id. at 100. The second inquiry involves "whether an independent source exists for that evidence." Id.

2. Because the gun and drugs were discovered almost immediately and without the occurrence of any intervening event, the court finds that it is derivative of the illegal stop and will be suppressed as "fruit of the poisonous tree." Wong Sun, 371 U.S. at 488.

### V. CONCLUSION

For the reasons stated, defendant's motion to suppress evidence is granted. An appropriate order shall issue.

14